**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| M.C., by and through his Parents, K.J-C and J.C., and K.J-C and J.C., individually,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAMSPORT AREA SCHOOL DISTRICT,<br><br>Defendant. | No. 4:25-CV-01831<br><br>(Chief Judge Brann) |

# MEMORANDUM OPINION

**OCTOBER 23, 2026**

This matter comes before the Court upon two dispositive motions: first, Plaintiffs', M.C., by and through his Parents, K.J-C and J.C., and K.J-C and J.C., individually (collectively, "Plaintiffs"), Motion for Judgment on Administrative Record;[1] and, second, Defendant Williamsport Area School District's ("Defendant" or the "District") Motion for Summary Judgment.[2] Following Plaintiffs' motion for oral argument,[3] the Court conducted arguments on the dispositive motions on September 17, 2026.[4] The parties' motions are now ripe for disposition. For the

1 Doc. 26.
2 Doc. 28.
3 Docs. 36-37.
4 *See* Docs. 43-45.

reasons stated below, the Court grants the Defendant's motion and denies the Plaintiffs' motion.

# I. BACKGROUND

## A. The Individual with Disabilities Education Act

The Individuals with Disabilities Education Act ("IDEA" or the "Act")[5] was enacted by Congress to "ensure that all children with disabilities have available to them a free appropriate public education."[6] Congress's expansive ambitions for this legislation are recorded in the Act's findings and purposes section.[7]

The Act is a model of so-called carrot-and-stick legislation. States are only subject to the compliance stick if they accept the appropriative carrot.[8] Accordingly, each public school district within a state that accepts federal IDEA funds must identify and evaluate all students reasonably believed to have a disability.[9] For those students identified as learning disabled, states receiving federal IDEA funds must provide a "free appropriate public education" or FAPE until they reach 21 years of age.[10]

---

5 20 U.S.C. § 1400 *et seq.*

6 *Id.* at § 1400(d)(1)(A); *see also Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 267-71 (3d Cir. 2014) (describing the Act's purposes and operation).

7 *See* 20 U.S.C. § 1400(c)-(d).

8 *A.W. v. Jersey City Pub. Schs.*, 341 F.3d 234, 247 (3d Cir.2003) ("The IDEA was enacted pursuant to the congressional spending power. [Thus, a] state is not generally bound by the IDEA unless it receives federal funding under the statute.") (internal citations omitted).

9 *Ridley Sch. Dist. v. M. R.*, 680 F.3d 260, 271 (3d Cir.2012).

10 20 U.S.C. § 1400(c)-(d).

To provide a FAPE, school districts must work with each disabled student's parents to create an individualized education plan ("IEP") that is compliant with various requirements contained in the Act and the Code of Federal Regulations.[11] The IEP is "the 'centerpiece' of the IDEA and the 'primary vehicle' for implementing the congressional policy underlying the Act."[12] Among other things, the IEP "must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide."[13] This does not mean that the education provided to students with disabilities must be *perfect*. Rather, the IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."[14] Thus, the IEP is often described as providing a "basic floor of opportunity" for students with disabilities.[15] Although progress under the IEP can be incremental, a meaningful educational benefit must be more than *de minimis*.[16]

A parent who finds their child's IEP—or the school district's implementation thereof—deficient may seek an administrative "impartial due process hearing" to

---

11 *W.B. v. Matula*, 67 F.3d 484, 492 (3d Cir.1995) (describing the IEP as the "primary mechanism" for delivering a FAPE), *abrogated on other grounds by A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791 (3d Cir.2007) (en banc).

12 *T.R. v. Sch. Dist. of Phila.*, 4 F.4th 179, 183 (3d Cir. 2021) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)).

13 *Ridley*, 680 F.3d at 276 (internal citations omitted).

14 *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017).

15 *Abigail P. through Sarah F. v. Old Forge Sch. Dist.*, 105 F.4th 57, 64 (3d Cir. 2024) (internal quotation marks omitted) (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir.2010)).

16 *See Endrew F.*, 580 U.S. at 402-03.

resolve their complaints.[17] Although states are granted limited discretion to determine how these hearings are conducted and by whom, Congress has legislated the "central components" of the administrative hearings by delineating pleading standards and guaranteeing the parties rights to counsel, to present evidence, and to cross-examine witnesses.[18] When this administrative process concludes, the losing party may seek redress in state or federal court.[19]

The United States Court of Appeals for the Third Circuit has held that a party challenging the implementation of an IEP "must show more than a *de minimis* failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement *substantial or significant provisions* of the IEP."[20] Indeed, the IDEA's text "counsels against making minor implementation failures actionable given that 'special education and related services' need only be provided '*in conformity with*' the IEP."[21] The statute's phrase "in conformity with" suggests that "general agreement or congruence, not perfect adherence, is the standard."[22] This materiality standard accordingly "affords local agencies some flexibility" while still "hold[ing] those agencies accountable for

17 20 U.S.C. § 1415(f).

18 *Schaffer v. Weast*, 546 U.S. 49, 54 (2005).

19 20 U.S.C. § 1415(i)(2)(A).

20 *Abigail P.*, 105 F.4th at 65 (internal quotation marks omitted) (quoting *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000)) (emphases in original).

21 *Id.* (quoting *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007) and 20 U.S.C. § 1401(9)).

22 *Id.* (internal quotation marks omitted) (quoting *L.J. ex rel. N.N.J. v. Sch. Bd. of Broward Cnty.*, 927 F.3d 1203, 1212 (11th Cir. 2019)).

material failures and for providing the disabled child a meaningful educational benefit."[23]

### B. Factual History

The facts of this case are familiar to the parties. This Court therefore provides only a brief summary of those facts at the outset and will incorporate additional facts as they are relevant to the discussion of the issues presented.[24]

M.C. is currently a ninth-grade student and lifelong resident of the Williamsport Area School District, where he attended District schools from kindergarten through December of his seventh-grade year (2024).[25] After becoming eligible to receive special education services in second grade, M.C. began receiving Wilson Reading Program instruction from the District for 60 minutes per day at the beginning of fourth grade (2021).[26] A few months later, in January 2022, the District increased this instruction to 90 minutes per day.[27] Over the next few years, M.C. continued receiving 90 minutes of Wilson instruction each day and also received some Wilson instruction during the summers.[28] In fifth and sixth grade, M.C.

---

23 *Id.* (internal quotation marks omitted) (quoting *Bobby R.*, 200 F.3d at 349).

24 The facts relevant to the parties' cross-motions are taken from the administrative record, (Doc. 8), and the parties' statements of material facts (Docs. 31, 33). Where unchallenged by either party, the Court also cites to the hearing officer's findings of fact (Doc. 8-3, at p. 9–22).

25 Doc. 33 ¶ 1; Doc. 8-3, at 9.

26 Doc. 8-3, at 9. The Wilson Reading Program is a "structured literacy methodology … considered the gold standard for reading instruction for students with learning disabilities, including dyslexia." *Id.* at 16-17. It is "supported by extensive peer-reviewed research supporting its efficacy." *Id.* at 16.

27 *Id.* at 10.

28 *Id.*

received this instruction during the English Language Arts (ELA) block.[29] Throughout this time, the District regularly worked with M.C.'s parents to provide M.C. with tailored, up-to-date IEPs.[30]

In January 2024, M.C.'s IEP team—including his parents—met to discuss M.C.'s upcoming transition to middle school as a seventh-grader in the 2024-25 school year.[31] Over a series of meetings, the District recommended that M.C. participate in the seventh-grade ELA class for 30 minutes per day and receive 60 minutes of Wilson instruction during the remainder of the ELA block.[32] M.C.'s parents expressed concerns about this plan but ultimately consented to it.[33]

That fall, M.C. began seventh grade with this plan in place. Throughout the semester, M.C.'s parents reported difficulties with his assistive technology and submitted videos supporting this claim.[34] In October, M.C.'s parents requested that the District place him at The Gow School ("Gow" or "private school"), a private New York college-preparatory school for students with learning disabilities.[35] The District refused this request in a Notice of Recommended Educational Placement

---

29 *Id.*
30 *See id.* at 9-19.
31 *Id.*
32 *Id.* at 11.
33 *Id.*
34 *Id.*
35 Doc. 30 ¶ 84; Doc. 31 ¶ 28.

("NOREP").[36] The parents rejected the NOREP but did not request a due process hearing or mediation.[37]

The IEP team again met in December 2024, and M.C.'s parents again requested private placement.[38] After the meeting, M.C.'s parents gave the District 10-day notice of their intent to enroll M.C. at a private school at District expense beginning that January.[39] Later that month, the school issued another NOREP denying M.C.'s parents' request for private placement.[40]

In January 2025, M.C. began attending Gow as a residential student.[41] Throughout that spring semester, M.C.'s parents, the District, and the private school remained in contact.[42] In March 2025, the District issued an updated IEP offering M.C. three days per week of Wilson instruction and two days per week of a "virtual evidence-based reading intervention."[43] The parents disapproved of the NOREP and two days later filed a due process complaint with Pennsylvania's Office for Dispute Resolution.[44]

---

36 Doc. 8-3, at 12. Pennsylvania school districts that seek to change or refuse to change a student's evaluation or placement status must provide the parent with a NOREP to satisfy IDEA's notice requirement. 20 U.S.C. § 1415(b)(3)(A).

37 Doc. 8-3, at 12.

38 *Id.*

39 *Id.*

40 *Id.*

41 *Id.* at 12

42 *See id.* at 12-13.

43 *Id.* at 13.

44 *Id.*

### C. Administrative Proceedings

In May 2025, an administrative due process hearing was held before a Hearing Officer ("HO") over the course of two days.[45] Plaintiffs primarily contended that the District failed to provide M.C. with a FAPE. Accordingly, Plaintiffs sought reimbursement for the unilateral placement of M.C. at Gow from January 25, 2025 through the end of the 2024-25 school year and a prospective placement for the 2025-26 school year.[46] Plaintiffs additionally sought compensatory education for an alleged denial of FAPE from March 2023 through January 25, 2025.[47] Finally, Plaintiffs sought additional compensatory education on the basis that the extended school year services provided by the District for the summers of 2023 and 2024 were not appropriate.[48] The District, however, contended that it provided M.C. a FAPE at all times and that, therefore, no relief was warranted.[49]

The HO found, in part, for both parties. Because the District failed to implement the material assistive technology provisions of M.C.'s IEP from the beginning of the 2024-25 school year through the middle of that October, the HO found that M.C. was owed relief in the form of compensatory education to be provided by the District totaling 90 minutes "for each school day during the period

---

45 *Id.* at 39.
46 *Id.* at 2. *See infra* for discussion regarding use of the term *prospective placement*.
47 *Id.*
48 *Id.*
49 *Id.*

of the denial of FAPE."[50] On all other issues, however, the HO found for the District.[51] Importantly, the HO found that tuition reimbursement was not warranted.[52] Plaintiffs appealed the HO's decision in a complaint filed with this Court on September 30, 2025.

## II. DISCUSSION

### A. Standard of Review

Challenges to administrative decisions under the IDEA are subject to "a nontraditional standard of review, sometimes referred to as 'modified de novo' review."[53] Under this standard, the Court is constrained to afford to "due weight" to the HO's findings.[54] Accordingly, the HO's factual findings are assumed to be prima facie correct and the Court must explain any departures from them.[55] Unless non-testimonial extrinsic record evidence supports a contrary conclusions, the Court "must accept the hearing officer's credibility determinations."[56] Nevertheless, IDEA expressly allows courts resolving civil actions under the statute to "hear additional evidence at the request of a party."[57] If the Court hears additional evidence it is "free to accept or reject the agency findings depending on whether those findings are

---

50 *Id.* at 47-48.
51 *Id.*
52 *Id.*
53 *D.S.*, 602 F.3d at 564 (citations omitted).
54 *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982).
55 *S.H. v. State–Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir.2003).
56 *Abigail P.*, 105 F.4th at 63 (citing *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012)).
57 20 U.S.C. § 1415(i)(2)(C)(ii).

supported by the new, expanded record and whether they are consistent with the requirements of the [IDEA]."[58]

The Court is not, however, "to substitute its own notions of sound educational policy for those of local school authorities."[59] "Within the confines of these standards, a district court is authorized to make findings based on the preponderance of the evidence and grant the relief it deems appropriate."[60] The Court is therefore left with the "unusual" task of making its findings by a preponderance of evidence while granting "due weight" to the HO's findings.[61] Moreover, the party challenging the HO's decision carries the burden of persuasion with respect to the finding for each claim challenged.[62]

**B. Analysis**

The Hearing Officer granted Plaintiffs 90 minutes of compensatory education for each day that M.C. was denied a FAPE and denied their request for tuition reimbursement. In their complaint, Plaintiffs seek (1) a reversal of the HO's decision and order; (2) reimbursement for M.C.'s cost of attending The Gow School from January 2025 through the end of the 2025-26 school year; (3) a finding that the District denied M.C. a FAPE from March 2023 through January 2025; (4) 930 hours

58 *S.H*, 336 F.3d at 270 (internal quotation marks omitted) (quoting *Oberti by Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1220 (3d Cir. 1993)).
59 *Id.* (internal quotation marks omitted) (quoting *MM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 531 (4th Cir.2002)).
60 *D.S.*, 602 F.3d at 564 (citations omitted).
61 *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir.2004).
62 *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 269 (3d Cir. 2014).

of compensatory education; (5) reimbursement for the cost of M.C.'s professional evaluation; and (6) reimbursement for Plaintiffs' prevailing party attorney's fees and cost, as well as any other relief this Court deems appropriate.[63] In its answer and counterclaim, Defendant seeks to affirm the HO's rulings against Plaintiffs and requests that judgment be entered in the Defendant's favor on all claims asserted in the Complaint.[64] Defendant's counterclaim further asks this Court to reverse the HO's award of compensatory education.[65]

### 1. The Hearing Officer's Procedures Did Not Deny M.C. a Free Appropriate Public Education

Plaintiffs first allege a series of procedural errors on the part of the HO that, in their words, amount to "substantive denials of FAPE."[66] These include: (1) excluding deposition testimony taken outside of the hearing process; (2) "diminishing" Plaintiffs' case for failing to submit a brief related to a claim made by Plaintiffs; (3) imposing various "nonexistent" rules of evidence; (4) refusing to consider Plaintiffs' reply brief because it was "unsolicited," and beyond his prescribed page limit; and (5) determining that Plaintiffs sought a "prospective placement" for the 2026-27 school year and, on that basis, applying a heightened standard of proof to their tuition reimbursement claim.[67]

---

63 Doc. 1, at 25.
64 Doc. 7, at 34.
65 *Id.* at 38-39.
66 Doc. 1, at 16.
67 Doc. 1 ¶¶ 90-93.

Congress has legislated the "central components" of the due process hearings under IDEA, including minimal pleading standards and rights to counsel, to presentation of evidence, and to confront, cross-examine, and compel the attendance of witnesses.[68] Beyond those minima, however, the Supreme Court has recognized that these hearings are "deliberately informal and intended to give ALJs the flexibility that they need to ensure that each side can fairly present its evidence."[69]

In the instant matter, the HO presided with an even hand. Faced with an "unusual amount of prehearing activity" and a "large number of prehearing motions," the HO carefully examined each party's requests and impartially dispensed wins and losses to each side.[70] The Court finds that none of the HO's procedural choices exceeded the "flexible" discretion afforded to IDEA hearing officers.[71]

Plaintiffs also allege that the HO erroneously classified M.C.'s requested enrollment at The Gow School for the 2025-26 school year as a "prospective placement." This classification was inaccurate, they claim, because M.C. was already a student at Gow and therefore enrollment for the succeeding year would merely be a continuation of his present enrollment.[72] Error begat error, according to

---

[68] *Schaffer*, 546 U.S. at 54 (citing 20 U.S.C. §§ 1415(b)(7)(B)(ii), 1415(h)(1)-(2)).
[69] *Id.* at 61.
[70] *See* Doc. 8-3, at 2-7.
[71] *See Schaffer*, 546 U.S. at 54.
[72] Doc. 1 ¶ 90.

Plaintiffs, as this led the HO to subject their request for tuition reimbursement for such a prospective placement to an artificially graduated standard of proof.[73]

The HO applied decisions from the Fifth and Eleventh Circuit Courts of Appeals to conclude that prospective private placement is "the exception," and available only "in egregious cases where the school district cannot provide FAPE."[74] Therefore, the HO held Plaintiffs to a "higher burden for a prospective private placement," and found that they failed to meet it.[75] Because the Third Circuit has not ruled on this question, this Court is not bound by these sister circuit decisions but may consider them as persuasive. But this Court need not assess their persuasive value now as, for the reasons that follow, Plaintiffs have failed to prevail under even *Burlington*/*Carter*'s more forgiving standard of proof.[76]

### 2. The Hearing Officer Correctly Denied Tuition Reimbursement

To obtain tuition reimbursement for a private placement, a plaintiff must prove that "the public placement violated IDEA and the private school placement was proper under the Act."[77] And even then, Courts retain equitable discretion "to

---

73 *Id.*

74 Doc. 8-3, at 23 (citing *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003 (5th Cir. 2010); *Draper v. Atlanta Independent School System*, 518 F.3d 1275 (11th Cir. 2008)).

75 *Id.* at 36.

76 *See Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359 (1985); *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7 (1993).

77 *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246 (2009) (internal quotation marks omitted) (quoting *Carter*, 510 U.S. 7, 15 (1993)).

reduce the amount of a reimbursement award if the equities so warrant."[78] These three inquiries compose what is colloquially referred to as the *Burlington/Carter* test.[79] To prevail under the *Burlington/Carter* test, Plaintiffs must succeed on all three prongs: (1) the public placement must have violated IDEA, (2) private school placement must be proper under the Act, and (3) the equities must not weigh against tuition reimbursement. The HO found that they failed on all three prongs. This Court agrees.

**a. The District Provided M.C. a Free Appropriate Public Education**

The HO found that the District did not deny M.C. the free appropriate public education required by the Act.[80] According to the HO, the "gravamen" of Plaintiffs' dispute was that "they contend that the [District] committed a substantive denial of FAPE by using the Wilson Reading program as the reading methodology for the student."[81] This methodological choice, according to the HO, is properly within the province of the District.[82] Moreover, the HO found that the District's peer-reviewed methodological choice of Wilson instruction was sound and did not violate IDEA.[83] Based on his review of the record, the HO determined that the M.C.'s IEPs—which

---

78 *Id.* at 247.

79 *See Sch. Comm. of Burlington*, 471 U.S. 359; *Carter*, 510 U.S. 7.

80 The HO's finding that the District did not deny M.C. a FAPE is subject to the exception outlined below relating to M.C.'s malfunctioning software. *See infra* at II.B.3.

81 Doc. 8-3, at 30.

82 *Id.*

83 *Id.*

included Wilson instruction—successfully met IDEA's minimal standard that they be "reasonably calculated to confer a meaningful benefit" to M.C. "in light of [his] circumstances."[84]

Throughout their complaint, Plaintiffs allege a wide range of erroneous findings of fact that they believe led the HO astray.[85] The parties are aware of these allegations, and the Court will not recount them in detail. Having reviewed the contested findings, and giving "due weight" to the HO, the Court finds that the HO's determination is well-supported by the record. Wilson instruction is peer-reviewed; Gow's proprietary Reconstructive Language model is not.[86] That M.C.'s IEPs were "reasonably calculated to confer is meaningful benefit," is evident from the record. They contained extensive goals tailored to M.C.'s circumstances; they offered specially-modified delivery models including both integrated and one-on-one instruction; they offered considerable supports and modifications including assistive technology, graphic organizers, and extended time for assignments. The Court agrees that the record—considered as a whole—shows "that [M.C.] made slow but steady actual progress while in the [District]" in light of his circumstances.[87] This is

---

84 *Endrew F*, 580 U.S. at 399.

85 *See* Doc. 1, at 17-21.

86 *See Ridley*, 680 F.3d at 276 (discussing IDEA's requirement that special education services be "based on peer-reviewed research to the extent practicable") (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(IV)); 34 C.F.R. § 300.320(a)(4) (codifying similar peer-review requirements).

87 The HO noted that M.C. made progress in areas of reading, writing, and general education. *See* Doc. 8-3 at 31-32. After reviewing the parties' extensive joint exhibits from the administrative record below, the Court agrees. For example, a comparison of M.C.'s 2021 Wechsler

what IDEA demands of the District. Therefore, Plaintiffs have not met their burden of persuasion on *Burlington*/*Carter*'s first prong.

**b. The Desired Private Placement is Not Proper**

Under *Burlington*/*Carter*'s second prong, a private placement is proper if it "provides significant learning and confers meaningful benefit."[88] It may not be "perfect,"[89] but it must provide services allowing the student to "make progress in reaching [his or] her academic, social, and behavioral goals."[90] IDEA requires that, "to the maximum extent appropriate," students be placed in the "least restrictive environment" ("LRE").[91] The Third Circuit has recognized that this requirement "sets forth a strong congressional preference for integrating children with disabilities in regular classrooms."[92] Indeed, federal regulations defining the LRE requirement establish that states must ensure that "[t]o the maximum extent appropriate, children with disabilities, … are educated with children who are nondisabled… [and that] [s]pecial classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids

---

Individual Achievement Test scores with his 2024 Woodcock-Johnson IV Test scores demonstrates considerable improvement across multiple categories. *Compare* Doc. 8-8, at 157-58 *with* Doc. 8-10, at 91-97.

88 *Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 242 (3d Cir. 2009).

89 *Id.*

90 *Lauren W. v. DeFlaminis*, 480 F.3d 259, 276 (3d Cir. 2007).

91 34 C.F.R. § 300.114(a)(2); 20 U.S.C. § 1412(a)(5)(A).

92 *Oberti*, 995 F.2d at 1213-14 (cleaned up).

and services cannot be achieved satisfactorily."[93] Additionally, and as noted, IDEA's provisions evince a preference for peer-reviewed, science-based instructional methodologies to the maximum extent appropriate.[94]

Shifting to this second prong, Plaintiffs seek to rebut an adverse inference drawn by the HO with new evidence. In his decision, the HO interpreted Plaintiffs' failure to supply already-collected assessment data as evidence that the assessment data "would have been adverse to the parents' position that the private school is appropriate."[95] To address this concern, this Court allowed Plaintiffs to supplement the administrative record with two new exhibits containing reports from Gow documenting M.C.'s progress during his first semester at the school.[96] The results are mixed. For example, in Gow's proprietary "Nonword Test,"[97] M.C. improved his score from the time of his admission to the end of the Spring semester from 45% to 60% correct.[98] On the Gray Oral Reading Test,[99] M.C. demonstrated marginal to modest growth depending on the measure selected.[100] On the Morrison-McCall

93 34 C.F.R. § 300.114(a)(2).

94 *See Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 276 (3d Cir. 2012); 34 C.F.R. § 300.320(a)(4).

95 Doc. 8-3, at 39.

96 *See* Docs. 16-17.

97 The test "consists of a list of nonsense words that the student reads aloud. Ability to sound out these unfamiliar entries is related to the application of the phonological and morphological structures of language and to correct sound sequencing. The result shown is the percent of correct responses." Doc. 9-12, at 4.

98 *Id.*

99 A test in which students "orally read timed, graded passages that are scored for rate (reading speed) and accuracy (word identification). Rate and accuracy are combined to indicate reading fluency." *Id.* at 5.

100 *Id.*

Spelling Test,[101] however, M.C.'s grade equivalent fell from 4.1 to 3.3.[102] The exhibits also show that M.C. received passing grades in the Spring semester and encouraging remarks from his teachers.[103] These supplements might move the needle in favor of Plaintiffs but, given their mixed nature, only marginally so.

Despite these additions, Plaintiffs have not cleared the high bar to prove that private placement at Gow would be proper. Private placements are initially suspect given their tension with IDEA's least-restrictive-environment mandate. At Gow, M.C. cannot be educated with nondisabled students because Gow "only accepts students with disabilities."[104] This fact is compounded by record evidence that students with severe dyslexia, like M.C., "do better when placed in general education English Arts classes."[105] Although the LRE requirement does not always counsel against a private placement, the Court agrees with the HO that M.C. "clearly does not need such a restrictive placement in order to benefit meaningfully[.]"[106]

Several other aspects of Gow's educational model counsel against M.C.'s private placement there. First, the Court agrees with the HO that Gow's proprietary Reconstructive Language method is not a peer-reviewed, evidence-based

---

101 A test in which students "write 50 dictated words of increasing complexity from the common vocabulary." *Id.* at 4.
102 *Id.*
103 *See generally* Doc. 9-13.
104 Doc. 8-3, at 38.
105 *Id.*
106 *Id.*

methodology.[107] Further, the Court is troubled by the lack of teaching certificates among its staff and the school's lack of accreditation in the state in which it is located.[108] For these reasons, the Court finds that Plaintiffs' requested private placement is not appropriate here.

Because Plaintiffs have not met their burden of persuasion on *Burlington/Carter*'s first two prongs, the Court need not consider whether the equities suggest that any tuition reimbursement award be curtailed. The Court therefore affirms the HO's decision that tuition reimbursement is not warranted.

### 3. The Hearing Officer Erroneously Granted Compensatory Education

Both parties challenge the HO's award of compensatory education in light of the District's denial of a FAPE from the beginning of the 2024-25 school year through mid-October 2024. The HO found that the District failed to implement a material provision of M.C.'s IEP—namely, by failing to fix his malfunctioning speech-to-text software.[109] According to the HO, this FAPE deprivation warranted a grant of compensatory education equaling 90 minutes for each day that M.C.'s speech-to-text software malfunctioned.[110]

---

[107] *Id.* at 38-39.
[108] *Id.* at 38.
[109] *Id.* at 43-45
[110] *Id.* at 48.

In Plaintiffs' view, the software malfunctioned from the beginning of the 2023-24 school year until M.C. left for Gow in January 2025, thus warranting additional compensatory education.[111] Defendant disagrees in its counterclaim, alleging that they *never* deprived M.C. of the material assistive technology provisions of his IEPs and therefore no compensatory education is warranted.[112] They note that the HO's finding of a denial of FAPE was based entirely on the malfunctioning of M.C.'s speech-to-text software, which the HO considered a "material part" of M.C.'s IEPs. This was erroneous, according to Defendants, because such speech-to-text technology—unlike text-to-speech technology—was not provided in the IEP as a program modification.[113] The IEP merely stated M.C. would "use speech-to-text technology … when his goal for writing was progress monitored twice monthly."[114]

The Court finds preponderant evidence that speech-to-text software was not a material provision of M.C.'s IEPs. Neither M.C.'s January 2022, November 2023, nor August 2024 IEPs reference speech-to-text technology as a program modification.[115] The record substantiates Defendant's assertion that M.C.'s IEPs only reference speech-to-text technology when directing the use of such technology

---

[111] Doc. 1 ¶ 116.
[112] Doc. 29, at 23-26.
[113] *Id.* at 23 n.3.
[114] *Id.*
[115] Doc. 8-8, at 101-02, 141-42, 250-52.

during M.C.'s bimonthly progress monitoring.[116] And, even there, the first reference to this technology arrives in M.C.'s August 2024 IEP, undermining the HO's finding that the deprivation occurred over a "long period of time."[117] Given these facts, the Court is persuaded that speech-to-text technology was not a material provision of M.C.'s IEPs. Accordingly, any alleged deprivation of the technology by the District is judged immaterial.

The Courts agrees, however, with the HO's residual findings regarding Plaintiffs' allegations of other technology issues. The record indicates that these remaining technology issues were resolved by the District within reasonable periods of their being reported. Likewise, the Court agrees with the HO that the extended school year services provided to M.C. by the District during the summers of 2023 and 2024 were appropriate. M.C. received 30 hours of one-on-one Wilson instruction during each of the two summers, and M.C.'s mother commented that the student made progress during the 2023 extended school year.[118] Although Wilson instruction may not have been the Plaintiffs' preferred methodology, they fail to prove that M.C.'s IEP was not reasonably calculated to confer meaningful

---

116 *Id.* at 249, 275.
117 Doc. 8-3, at 43.
118 *Id.* at 45-46.

educational benefit in light of his circumstances.[119] Therefore, the District did not deny M.C. a FAPE.

Accordingly, the Court finds that the HO's award of compensatory education to Plaintiffs was granted in error and must be vacated.

#### 4. The Hearing Officer Correctly Denied Reimbursement for M.C.'s Evaluation

Plaintiffs finally request reimbursement for the cost of the evaluation of M.C. conducted by their expert witness. The HO decided that, because the expert's report and testimony were not helpful in determining whether the school district denied M.C. a FAPE, Plaintiffs were not entitled to reimbursement for the expert evaluation. This Court agrees and affirms the HO's decision.

#### 5. Prevailing Party Attorney's Fees Are Unwarranted

Because Plaintiffs are not the prevailing party, attorney's fees are not warranted in their favor.

---

[119] The HO's decision on this question was also predicated on his determination that the District's witnesses were more credible and persuasive than those of the Plaintiffs. *Id.* at 46. Absent extrinsic non-testimonial evidence, the Court is constrained to defer to these credibility determinations. *Abigail P.*, 105 F.4th at 63 (citing *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012)).

## III. CONCLUSION

For these reasons, Plaintiffs' motion is denied and Defendant's motion is granted.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge